## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| OMAR SEY, on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>KNORR-BREMSE AG; KNORR BRAKE COMPANY LLC; NEW YORK AIR BRAKE LLC; BENDIX COMMERCIAL VEHICLE SYSTEMS LLC; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; WABTEC RAILWAY ELECTRONICS, INC.; FAIVELEY TRANSPORT NORTH AMERICA, INC.; and RAILROAD CONTROLS, L.P.,<br><br>       Defendants. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................................1

II.     THE PARTIES...............................................................................................................5

        A.      Plaintiff ............................................................................................................ 5

        B.      Defendants ....................................................................................................... 5

III.    JURISDICTION AND VENUE ....................................................................................7

IV.     NATURE OF THE RAIL EQUIPMENT SUPPLIES INDUSTRY ..................................8

V.      DEPARTMENT OF JUSTICE INVESTIGATION .........................................................11

        A.      The Department of Justice Reinvigorated Investigating No-Poach
                Agreements .................................................................................................... 11

        B.      DOJ Investigated Defendants and Enjoined Them From Entering No-
                Poach Agreements .......................................................................................... 12

VI.     DEFENDANTS' UNLAWFUL AGREEMENTS.............................................................14

        A.      Wabtec and Knorr Enter No-Poach Agreements ................................................. 14

        B.      Knorr and Faiveley Enter No-Poach Agreement ................................................. 17

        C.      Wabtec and Faiveley Enter No-Poach Agreement ............................................... 18

VII.    EFFECTS OF THE SCHEME ON COMPETITION AND ANTITRUST INJURY
        TO PLAINTIFF AND MEMBERS OF THE CLASS.......................................................19

VIII.   EFFECTS ON INTERSTATE COMMERCE..................................................................20

IX.     CLASS ACTION ALLEGATIONS ..............................................................................21

X.      PLAINTIFF'S CLAIMS ARE TIMELY .......................................................................23

        A.      Defendants Have Engaged in a Continuing Violation .......................................... 23

        B.      Fraudulent Concealment Tolled the Statute of Limitations.................................... 24

XI.     CLAIMS FOR RELIEF...............................................................................................26

        FIRST CLAIM FOR RELIEF
        Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ................................................. 26

XII.    DEMAND FOR JUDGMENT............................................................................................27

XIII.   JURY DEMAND ...........................................................................................................28

Plaintiff Omar Sey ("Plaintiff") brings this class action, on behalf of himself and all others similarly situated, for claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages and obtain injunctive relief for injuries caused by Defendants Knorr-Bremse AG, Knorr Brake Company LLC, New York Air Brake LLC, Bendix Commercial Vehicle Systems LLC, Westinghouse Air Brake Technologies Corporation, Wabtec Railway Electronics, Inc., Faiveley Transport North America, Inc., and Railroad Controls, L.P. (together "Defendants"). The allegations herein are based on Plaintiff's personal knowledge as to his own acts and on information and belief as to all other matters, such information and belief having been informed by the extensive investigation conducted by and under the supervision of his counsel. This investigation includes interviews of former employees of Defendants with direct knowledge of the matters alleged herein (some of whom have provided information in confidence. These confidential witnesses ("CWs") will be identified herein by number – CW1, CW2, etc.). On behalf of himself and the Class he seeks to represent (as defined below), Plaintiff alleges as follows:

## I.    NATURE OF THE ACTION

1.    Plaintiff's claims stem from a conspiracy to enter a series of unlawful agreements among Defendants, the world's largest rail equipment suppliers and their related subsidiaries, to restrain competition in the labor markets in which they compete for employees. Defendants Knorr-Bremse AG and its wholly-owned subsidiaries Knorr Brake Company LLC, New York Air Brake LLC, and Bendix Commercial Vehicle Systems LLC (collectively, "Knorr") and Westinghouse Air Brake Technologies Corporation, Wabtec Railway Electronics, Inc., Faiveley Transport North America, Inc., and Railroad Controls, L.P.  (collectively, "Wabtec") are each other's top competitors for rail equipment used in freight and passenger rail applications. They also compete with each other to attract, hire, and retain skilled employees, including rail industry

project managers, engineers, sales executives, business unit heads, and corporate officers. Prior to its acquisition by Westinghouse Air Brake Technologies Corporation ("Westinghouse") in November 2016, Faiveley Transport S.A. and its wholly-owned subsidiary Defendant Faiveley Transport North America, Inc. also competed with Knorr and Wabtec to attract, hire, and retain skilled employees in the rail equipment industry.

2.      However, rather than compete to attract the best employees by offering more attractive salary and benefits packages to prospective job seekers, Defendants instead conspired to enter into a series of agreements intended to circumvent competition for employees and suppress wages and job opportunities.

3.      The unlawful agreements among Defendants—which Defendants sometimes referred to as "gentlemen's agreements" according to Plaintiff's counsel's independent investigation—included promises and commitments not to solicit, recruit, hire without prior approval, or otherwise compete for employees (collectively, "no-poach agreements").

4.      Beginning no later than 2009, senior executives at Knorr-Bremse and Westinghouse entered into a no-poach agreement with one another. Beginning no later than 2011, senior executives at certain U.S. subsidiaries of Knorr and Faiveley entered into a no-poach agreement with one another. And beginning no later than January 2014, senior executives at the U.S. passenger rail businesses of Wabtec and Faiveley entered into a no-poach agreement with one another.

5.      These no-poach agreements spanned several years and were monitored and enforced by high-level company executives.  They were not reasonably necessary to any separate, legitimate business transaction or collaboration among the companies.

6.      Critically, Defendants agreed to restrict competition for their employees' services with the purpose and effect of suppressing compensation and potential new job opportunities and restraining competition in the market for their employees' services.

7.      The Department of Justice's Antitrust Division ("DOJ") first uncovered and investigated Defendants' no-poach agreements. DOJ found that Defendants' agreements were "facially anticompetitive" and were illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C § 1. As DOJ explained, the no-poach agreements "eliminated a significant form of competition to attract skilled labor in the U.S. rail industry" and "denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment."

8.      The undersigned Plaintiff's counsel also conducted an independent investigation of the unlawful no-poach agreements (which is ongoing), which included interviews with numerous former employees of Defendants with direct knowledge of the conspiracy alleged herein. This extensive investigation not only confirmed much of the conduct identified by DOJ, but also expanded the case by uncovering substantial additional direct evidence in support of Plaintiff's claims.

9.      For example, CW1, a former systems engineer for Knorr Brake Company LLC, described the existence of a gentlemen's agreement between Knorr Brake and Wabtec not to recruit or hire each other's skilled employees, especially engineers. According to CW1, Knorr Brake refused to hire individuals from Wabtec despite a shortage of skilled employees at Knorr Brake.

10.     CW2, a former Knorr Brake employee familiar with the policies and practices of Knorr Brake's Human Resources Department, described how the no-poach agreements

foreclosed consideration of applicants employed by Wabtec or Knorr Brake Company without prior approval of the other firm. The firms had specific procedures in place to deal with these applicants. CW2 stated that external recruiters were also obligated to abide by these procedures.

11.    DOJ's investigation concluded with the filing in the United States District Court for the District of Columbia of a Stipulation and Order and proposed Final Judgment, which would enjoin Defendants from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision. "No-Poach Agreement" and "No-Poach Provision" are defined in the Stipulation and Order as an agreement "among two or more employers that restrains any person from cold calling, soliciting, recruiting, hiring, or otherwise competing for (i) employees located in the United States being hired to work in the United States or outside the United States or (ii) any employee located outside the United States being hired to work in the United States."

12.    While DOJ was able to secure injunctive relief to stop the unlawful conduct, it did not seek monetary penalties of any kind against Defendants and made no effort to compensate employees of Defendants who were harmed by Defendants' anticompetitive conduct. Without this class action, Plaintiff and the Class would be unable to obtain compensation for the harm they suffered, and Defendants would retain the benefits of their unlawful conspiracy.

13.    Defendants' no-poach agreements are *per se* unlawful restraints of trade that violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff, on his own behalf and on behalf of the Class, seeks to recover the difference between the compensation that Class members were paid and what Class members would have been paid absent Defendants' no-poach agreements. Plaintiff further seeks to enjoin Defendants from repeating or engaging in their unlawful conduct.

## II.    THE PARTIES

### A.    Plaintiff

14.    Plaintiff Omar Sey worked for Wabtec Railway Electronics, Inc. during the class period. He resides in Gaithersburg, Maryland. At multiple points during his time at Wabtec, Mr. Sey submitted employment applications for available positions at Knorr Brake Company LLC, but he never received an interview or employment offer. As a result of the Defendants' no-poach agreements, Mr. Sey earned less than he would have absent the alleged agreements.

### B.    Defendants

15.    Defendant Knorr-Bremse AG ("Knorr-Bremse") is a privately-owned German company with its principal place of business located at Moosacher Straße 80, 80809 Munich, Germany. Knorr-Bremse is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment. In 2017, Knorr-Bremse had annual revenues of approximately $7.7 billion. Knorr-Bremse employs approximately 28,000 people worldwide.

16.    Defendant Knorr Brake Company LLC ("Knorr Brake") is a Delaware corporation with its principal place of business located at 1 Arthur Peck Drive, Westminster, Maryland 21157. It manufactures train control, braking, and door equipment used on passenger rail vehicles. Knorr Brake is a wholly-owned subsidiary of Knorr-Bremse.

17.    Defendant New York Air Brake LLC ("NY Air Brake") is a Delaware corporation with its principal place of business located at 748 Starbuck Avenue, Watertown, New York 13601. It manufactures railway air brakes and other rail equipment used on freight trains. NY Air Brake is a wholly-owned subsidiary of Knorr-Bremse.

18.    Defendant Bendix Commercial Vehicle Systems LLC ("Bendix") is a Delaware company with its principal place of business located at 901 Cleveland Street, Elyria, Ohio 44035. Bendix develops and supplies active safety technologies, air brake charging, and control systems

and components for medium- and heavy-duty trucks, tractors, trailers, buses, and other commercial vehicles. It is a wholly-owned subsidiary of Knorr-Bremse.

19.     Defendant Westinghouse Air Brake Technologies Corporation ("Westinghouse") is a Delaware corporation with its principal place of business located at 1001 Air Brake Avenue, Wilmerding, Pennsylvania 15148. With over 100 subsidiaries and more than 18,000 employees, Westinghouse is one of the world's largest providers of rail equipment and services. Westinghouse had global sales of nearly $3.9 billion in 2017. Wabtec Passenger Transit is a business unit of Westinghouse that develops, manufactures, and sells rail equipment and services for passenger rail applications. Wabtec Passenger Transit has multiple locations in the U.S. and China, with its main site in Spartanburg, South Carolina.

20.     Defendant Wabtec Railway Electronics, Inc. ("Wabtec Railway") is wholly-owned subsidiary of Westinghouse and a Delaware corporation with its principal place of business located at 21200 Dorsey Mill Road, Germantown, Maryland 20876. It designs, develops, manufactures, and repairs electronic products used to improve railroad operations and safety.

21.     Defendant Faiveley Transport North America, Inc. ("Faiveley Transport") is a wholly-owned subsidiary of Westinghouse and a New York corporation with its principal place of business located at 50 Beechtree Boulevard, Greenville, South Carolina 29605. Faiveley Transport was a former subsidiary of Faiveley Transport S.A. ("Faiveley"). Faiveley, which had been a French société anonyme based in Gennevilliers, France, was acquired by Westinghouse on November 30, 2016. Before the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Westinghouse and Knorr. Faiveley had nearly 6,000 employees across 24 countries, including at six U.S. locations. It developed, manufactured, and sold

passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.1 billion in 2016. In the United States, Faiveley conducted business primarily through Faiveley Transport.

22.    Defendant Railroad Controls, L.P. is a Texas company with its principal place of business located at 9800 Hillwood Parkway, Suite 340, Fort Worth, Texas 76177. It is one of the largest railroad signal construction companies in the United States and a wholly-owned subsidiary of Westinghouse.

## III.    JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

24.    Venue is appropriate within this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on, the interstate commerce of the United States, including in this District.

25.    The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

**IV.    NATURE OF THE RAIL EQUIPMENT SUPPLIES INDUSTRY**

26.    Knorr and Wabtec (which now includes Faiveley) are among the world's largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.

27.    Defendants compete with each other and with firms at other tiers of the rail industry supply chain to attract, hire, and retain skilled employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

28.    There is a high demand for, and limited supply of, skilled employees who have rail industry experience.

29.    Many of the available positions in the industry require a B.S. in engineering or another technical discipline. Other positions require knowledge of specialized tools, systems, and/or software. Positions may also require computer programming skills and knowledge of programming languages such as C++. Management positions require extensive business experience in addition to technical skills and knowledge.

30.    Among other things, Defendants produce brake and train control systems for freight and passenger rail applications. Such systems need to be designed to comply with all applicable regulations and must undergo rigorous testing. Certain employees are therefore required to have an understanding of all requirements necessary for the design of rail braking systems and must be able to design and carry out proper test procedures.

31.    Because of the high degree of specialized skill involved, employers in the industry, such as Defendants, prefer to hire individuals with prior railroad or transportation industry experience rather than recruit more broadly.

32.     Moreover, the rail industry faces unique employment challenges, including a talent shortage and an aging workforce.[1] CW1 confirmed the talent shortage in the industry, specifically adding that the pool of engineers who specialize in rail systems was small compared to other fields of engineering.

33.     Compared to similar fields, the actual work for employees in the industry can be grueling. CW1 recalled often working between 10 to 14 hours per day and testing brake systems well into the early morning hours.

34.     Yet, notwithstanding the high degree of training necessary for the positions and the exhausting work, Defendants' employees are not particularly well compensated for their services. CW1 did not receive a raise while employed by Knorr Brake and was only offered two weeks of vacation, despite having decades of experience in engineering. According to CW1, when General Dynamics, which had been working on an unmanned vehicle for the military, decided to relocate from Maryland, Knorr Brake hired a number of engineers from that company who did not wish to relocate. When they joined Knorr Brake, these engineers took a 25% pay cut.

35.     As a result of these factors, firms in the rail industry can experience vacancies for critical roles for months while they try to recruit and hire individuals with the requisite skills, training, and experience. Employees of other rail industry participants, including the employees of Defendants' customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

---

[1] Pat Foran, *Talent drain puts rail industry on the executive recruitment beat*, PROGRESSIVE RAILROADING (Apr. 2014), https://www.progressiverailroading.com/rail_industry_trends/article/Talent-drain-puts-rail-industry-on-the-executive-recruitment-beat--40125.

36.    Firms in the rail industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees. Rail companies also receive direct applications from individuals interested in potential employment opportunities.

37.    Directly soliciting employees from another rail industry participant is a particularly efficient and effective method of competing for qualified employees. Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.

38.    Firms in the rail industry rely on direct solicitation of employees of other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

39.    In addition, the rail industry is an insular one in which employees at different firms often forge long-term contacts. As one outside recruiter in the industry described, "It's a very close-knit industry" that is "still relationship based."[2] Thus, if a job opportunity arises at one firm, employees there often look to their professional networks to find candidates to fill the vacancy.

40.    In a competitive labor market, rail industry employers compete with one another to attract highly-skilled talent for their employment needs. This competition benefits employees because they learn about additional job opportunities and, with access to that information, can

---

[2] *Id.*

either switch employers or negotiate for a better salary and/or other terms of employment at their current job. In either situation, competitive recruitment practices benefit employees. Defendants' no-poach agreements, however, restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

## V.    DEPARTMENT OF JUSTICE INVESTIGATION

### A.    The Department of Justice Reinvigorated Investigating No-Poach Agreements

41.    Anti-poaching agreements among competitors have always been unlawful under the antitrust laws. Notwithstanding, in October 2016, DOJ's Antitrust Division and the Federal Trade Commission issued Antitrust Guidance For Human Resource Professionals (the "Guidance"). DOJ issued the Guidance to help HR professionals implement safeguards to prevent inappropriate discussions or agreements with other firms seeking to hire similar employees.

42.    In the Guidance, DOJ alerted HR professionals and others involved in hiring and compensation decisions that "[a]n agreement among competing employers to limit or fix the terms of employment for potential hires may violate the antitrust laws if the agreement constrains individual firm decision-making with regard to wages, salaries, or benefits; term of employment; or even job opportunities." The Guidance specifically called out the illegality of no-poach agreements: "An individual likely is breaking the antitrust laws if he or she . . . . agrees with individual(s) at another company to refuse to solicit or hire that other company's employees (so-called 'no poaching' agreements)."

43.    The following month, on November 17, 2016, acting assistant attorney general of DOJ's Antitrust Division, Renata B. Hesse, stated, "[G]oing forward employers who conspire to hold down wages or restrict hiring of each other's workers will be investigated criminally and, if

appropriate, prosecuted criminally. Naked 'no-poaching' agreements or agreements to fix wages stamp out competition just like agreements to allocate customers or to fix product prices, violations of the law that the Division has traditionally investigated criminally and prosecuted as hardcore cartel conduct."

44.    DOJ officials under the current administration have reiterated that they would continue to prosecute naked no-poach agreements. For instance, on September 12, 2017, Principal Deputy Assistant Attorney General Andrew C. Finch stated that employers "should be on notice that a business across the street from them—or, for that matter, across the country— might not be a competitor in the sale of any product or service, but it might still be a competitor for certain types of employees such that a naked no-poaching agreement, or wage-fixing agreement, between them would receive per se condemnation."

45.    On January 19, 2018, Makan Delrahim, Assistant Attorney General for DOJ's Antitrust Division, speaking at a conference sponsored by the Antitrust Research Foundation at George Mason University in Virginia, stated that the agency remained "very active" in policing no-poach agreements between employers.

46.    Soon thereafter, on January 23, 2018, Mr. Finch, speaking to the Heritage Foundation, further stated that the "Division will continue to monitor closely . . . the employer-employee relationship and, in particular, what are sometimes called 'employee no-poach' agreements." He also stated that "the Division expects to initiate multiple no-poach enforcement actions in the coming months."

   **B.    DOJ Investigated Defendants and Enjoined Them From Entering No-Poach Agreements**

47.    DOJ's Antitrust Division has been investigating Defendants' no-poach agreements since at least 2016. The investigation stemmed from DOJ's review of Wabtec's

acquisition of Faiveley, which uncovered the illegal no-poach agreements at issue in this complaint. A separate investigation into the no-poach agreements ensued thereafter.

48.    Regarding the no-poach agreements, DOJ found that they were "facially anticompetitive" and *per se* illegal under the Sherman Act. As DOJ explained, the agreements "eliminated a significant form of competition to attract skilled labor in the U.S. rail industry" and "denied employees access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment." DOJ determined that these agreements "disrupted the typical bargaining and negotiation between employees and employers that ordinarily would take place in these labor markets." DOJ concluded that the "No-Poach Agreements were naked restraints on competition for employees and were not reasonably necessary to any separate, legitimate business transaction or collaboration between the firms."

49.    On April 3, 2018, DOJ filed a complaint in federal court against Knorr and Wabtec. DOJ also filed a stipulated proposed judgment in which Knorr and Wabtec—and their successors and assigns, subsidiaries, divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents, and employees—agreed to be "enjoined from attempting to enter into, entering into, maintaining, or enforcing any No-Poach Agreement or No-Poach Provision." Knorr and Wabtec also agreed to a variety of enforcement measures and to cooperate with the United States in any investigation or litigation. The stipulated proposed final judgment is currently pending before the United States District Court for the District of Columbia.

50.    That same day, Knorr publicly announced that it reached a settlement with DOJ regarding its no-poach agreements. The statement stated that Knorr "has agreed to the Settlement to put this matter behind it and to continue its focus on providing state-of-the-art systems,

services, and integrated solutions to its customers." Wabtec also released a statement saying that it "elected to settle this matter to avoid the cost and distraction of litigation."

51.    DOJ did not seek monetary penalties of any kind against Defendants and made no effort to compensate employees of the Defendants who were harmed by Defendants' anticompetitive conduct.

52.    Without this class action, Plaintiff and members of the Class would be unable to obtain compensation for the harm they suffered, and Defendants would retain the benefits of their unlawful conspiracy.

## VI.    DEFENDANTS' UNLAWFUL AGREEMENTS

53.    Defendants conspired to suppress the compensation paid to their employees. To accomplish their conspiratorial goals, Defendants entered into a series of no-poach agreements, which Plaintiff describes in detail below.

### A.    Wabtec and Knorr Enter No-Poach Agreements

54.    Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. More specifically, senior executives at both companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire one another's employees. These no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

55.    Beginning no later than 2009, Wabtec's and Knorr Brake's most senior executives entered into an express no-poach agreement and then actively managed it through direct

communications with each other. For example, in a letter dated January 28, 2009, a director of

Knorr Brake wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that

our practice of not targeting each other's personnel is a prudent cause for both companies. As

you so accurately put it, 'we compete in the market.'" Although the no-poach agreement was

between Wabtec and Knorr's U.S. passenger rail subsidiary, it was well-known to senior

executives at the parent companies, including top Knorr executives in Germany who were

included in key communications about the no-poach agreement.

56.    In addition, CW2 stated that HR personnel from Knorr Brake were copied on

emails describing the no-poach agreement with Wabtec and authored emails reminding others

not to poach employees from Wabtec.

57.    Wabtec and Knorr Brake's no-poach agreement foreclosed the consideration of

unsolicited applicants employed by Wabtec or Knorr Brake without prior approval of the other

firm. In a 2010 internal communication retrieved by DOJ, a senior executive at Knorr Brake

stated that he would not consider a Wabtec candidate who applied to Knorr Brake without the

permission of his counterpart at Wabtec.

58.    More specifically, CW2 explained that under the terms of the agreement, if an

employee from Wabtec applied for a position at Knorr Brake, HR personnel were required to

flag that applicant and alert the hiring manager at Knorr Brake. Thereafter, the president of

Knorr Brake would have to be consulted. If Knorr Brake wanted to pursue the candidate further,

the president of Knorr Brake would seek permission from Wabtec.

59.    CW2 further stated that, on at least one occasion, in the fourth quarter of 2016, a

skilled employee from Wabtec applied to Knorr Brake and made it through the initial hiring

phases. Before being offered the position, Knorr Brake realized that the applicant was a current

Wabtec employee. Upon learning this information, the applicant was dropped from the hiring process.

60.     In furtherance of their agreement, Wabtec and Knorr Brake also informed their outside recruiters not to solicit employees from the other company.

61.     For instance, according to CW2, Knorr Brake informed external recruiters that if they happened to find someone from Wabtec that was qualified for an open position, the recruiter should inform Knorr Brake HR staff, who would then discuss the applicant with the president of Knorr Brake. The president of Knorr Brake would then call Wabtec to discuss how to proceed with the applicant.

62.     Because recruitment resources were limited, Defendants also relied on a sister company not involved in the rail industry for recruitment purposes. Like the external recruiters, this entity was given specific instructions consistent with Defendants' no-poach agreements. For example, CW2 indicated that Knorr Brake used Bendix, one of its subsidiaries, as a recruitment liaison to assist in filling certain job vacancies at Knorr Brake. Knorr Brake instructed Bendix to be leery of engaging with Wabtec employees. Further, Knorr Brake instructed Bendix to notify them immediately if a Wabtec employee was qualified for a position. From there, Knorr Brake HR personnel would consult with Knorr Brake management for instructions on how to proceed with the individual. To CW2's knowledge, no Wabtec employee was hired by Knorr Brake through Bendix.

63.     CW1 described the lengths Defendants took to preserve their no-poach agreements—even when dealing with a limited supply of qualified workers. For instance, in mid-2016, CW1 had a discussion with a Knorr Brake program manager about hiring new engineers. At that time, there was a shortage of engineers at Knorr Brake. To fill vacant positions, CW1

asked the program manager if they could recruit engineers from Wabtec. The program manager told CW1 that Knorr Brake and Wabtec had an unwritten gentlemen's agreement not to recruit or hire each other's skilled employees, especially engineers.

64.    Engineers were not the only skilled employees affected by the no-poach agreements. CW3, a former technical illustrator for Knorr Brake, was told by a senior manager that Wabtec would not hire anyone that worked for Knorr Brake and vice-versa.

65.    Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with one another to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had allegedly solicited a Knorr Brake employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

66.    Wabtec and Knorr's no-poach agreements also reached the companies' U.S. freight rail businesses. In July 2012, for example, a senior executive at NY Air Brake informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

### B.    Knorr and Faiveley Enter No-Poach Agreement

67.    Beginning no later than 2011, senior executives at Knorr Brake and Faiveley Transport reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company. In October 2011, a senior executive at Knorr Brake explained in an e-mail to a high-level executive at Knorr-

Bremse that he had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job." Executives at Knorr Brake and Faiveley's U.S. subsidiary actively managed the agreement with each other through direct communications.

68.     In or about 2012, a senior executive at Knorr Brake discussed the companies' no-poach agreement with an executive at Faiveley Transport. This discussion took place at a trade show in Berlin, Germany. Subsequently, the executives enforced the no-poach agreement with each other through direct communications. This no-poach agreement was known to other senior executives at the companies, who directly communicated with one another to ensure adherence to the agreement. For example, in October 2012, executives at Faiveley Transport stated in an internal communication that they were required to contact Knorr Brake before hiring a U.S. train brake engineer.

69.     The companies continued their no-poach agreement until at least 2015.

**C.     Wabtec and Faiveley Enter No-Poach Agreement**

70.     Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

71.     Wabtec Passenger Transit and Faiveley Transport executives actively managed and enforced their agreement with each other through direct communications. For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley Transport without first getting permission from Faiveley Transport executives. In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own

agreement with [Faiveley Transport]." Only after receiving permission from Faiveley Transport

did Wabtec Passenger Transit hire the project manager. One month later, a Wabtec Passenger

Transit senior executive informed his staff that hiring Faiveley Transport's employees was "off

the table" due to the agreement with Faiveley Transport not to engage in hiring discussions with

each other's employees without the other's prior approval.

72.    In July 2015, Wabtec and Faiveley publicly announced their intent to merge.

Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a

wholly-owned subsidiary of Wabtec.

## VII.    EFFECTS OF THE SCHEME ON COMPETITION AND ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

73.    Defendants' conspiracy suppressed Plaintiff's and the Class's compensation and

restricted competition in the labor market in which Plaintiff and the other Class members sold

their services. Defendants accomplished this through their unlawful no-poach agreements.

74.    In a competitive labor market, rail industry employers would compete with one

another to attract skilled talent for their employment needs. As DOJ's Guidance explains,

"competition among employers helps actual and potential employees through higher wages,

better benefits, or other terms of employment."

75.    Defendants' no-poach agreements intended to and did suppress compensation.

Direct solicitation from competing employers has a significant beneficial impact for individual

employees' compensation. Competing employers may make offers that exceed an employee's

current salary, allowing her to receive a higher salary by either changing employers or

negotiating increased compensation from her current employer. In addition, recruits often inform

other employees of the offers they have received. Such information spreading can lead to

movement or negotiation by those other employees.

76.    No-poach agreements similarly affect compensation practices by employers. A firm that directly solicits competitors' employees will learn whether its offered compensation is enough to attract its competitors' employees and may increase an offer to make itself more competitive. Similarly, companies losing, or at risk of losing, employees to competitors may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

77.    Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation. Restraining direct recruitment made higher pay opportunities less transparent to workers and thus allowed employers to keep wages and salaries down.

78.    The beneficial effects of free and open solicitation are not limited to the particular individuals solicited or to the particular individuals who would have been solicited but for the no-poach agreements. Rather, the effects of eliminating direct solicitation impacted all members of the Class: those employed by Defendants during the Class Period.

79.    Defendants' conspiracy restricted competition in the labor market in which Plaintiff and the Class sold their services. As a result, Plaintiff and the Class maintained lower salaries, reduced benefits, and restricted job opportunities.

## VIII.  EFFECTS ON INTERSTATE COMMERCE

80.    During the Class Period (as defined below), Defendants employed Plaintiff and Class members in multiple states, including Maryland, New York, Pennsylvania, and South Carolina.

81.    Defendants recruit and hire skilled employees throughout the United States. Such activities are in the flow of and substantially affect interstate commerce.

82.     Defendants' conduct substantially affected interstate commerce in that Defendants deprived Plaintiff and the Class of the benefits of solicitation from out-of-state employers and restricted Class members' ability to move between states to pursue opportunities with different employers.

## IX.    CLASS ACTION ALLEGATIONS

83.     Plaintiff sues on his own behalf and, pursuant to Federal Rule of Civil Procedure 23(b)(3) and (b)(2), as a representative of a class (the "Class") seeking damages and other relief defined as:

> All natural persons employed by Defendants or their wholly owned subsidiaries at any time from January 1, 2009, to April 3, 2018 (the "Class Period"). Excluded from the Class are officers, directors, senior executives, personnel in the human resources and recruiting departments of the Defendants, employees hired outside of the United States to work outside of the United States, all Counsel of Record, the Court, Court personnel, and any member of their immediate family.

84.     The Class contains thousands of members, as each Defendant employed hundreds, if not thousands, of Class members each year. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Moreover, given the costs of complex antitrust litigation, it would be cost prohibitive for many plaintiffs to bring individual claims and join them together. The Class is readily identifiable from information and records in Defendants' possession.

85.     Plaintiff's claims are typical of the claims of other Class members as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole.

86.     Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

87.     Plaintiff has retained able and experienced antitrust and class action litigators as his counsel. Plaintiff has no conflicts with other Class members and will fairly and adequately protect the interests of the Class.

88.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

89.     Questions of law and fact common to the Class include, but are not limited to:

(a)     Whether Defendants entered into no-poach agreements to restrict competition in the labor market in which Plaintiff and the other Class members sold their services;

(b)     The scope and duration of the unlawful agreements;

(c)     Whether such agreements were *per se* violations of the Sherman Act;

(d)     Whether Defendants' no-poach agreements caused injury to the business or property of Plaintiff and other members of the Class;

(e)     Whether any such injury constitutes antitrust injury;

(f)     The appropriate measure of damages suffered by Plaintiff and other members of the Class;

(g)     Whether Plaintiff and other members of the Class are entitled to injunctive relief; and

(h)    The nature and scope of injunctive relief necessary to restore a competitive market.

90.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

91.    Injunctive relief is appropriate with respect to the Class as a whole, because Defendants have acted on grounds generally applicable to the Class.

92.    Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

X.    **PLAINTIFF'S CLAIMS ARE TIMELY**

A.    **Defendants Have Engaged in a Continuing Violation**

93.    This complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations.

94.    Each time Defendants engaged in wrongful communications regarding the no-poach agreements, restricted an applicant's ability to advance through the hiring process on account of the no-poach agreements, or otherwise abided by, attempted to enforce, or reaffirmed the no-poach agreements, Defendants undertook an overt act that has inflicted harm on Plaintiff and members of the Class.

95.     Moreover, the statute of limitations is suspended pursuant to 15 U.S.C. § 16(i) by reason of the proceeding brought by DOJ on April 3, 2018 against Defendants based on the same matters complained of in this action.

96.     Because Defendants have engaged in a continuing course of conduct, Plaintiff's claims are timely.

**B.     Fraudulent Concealment Tolled the Statute of Limitations**

97.     Additionally, application of the doctrine of fraudulent concealment tolled the statute of limitations on Plaintiff's claims.

98.     During the relevant statute of limitations period, Plaintiff had neither actual nor constructive knowledge of the pertinent facts constituting his claims for relief asserted herein. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants entered into no-poach agreements that violated federal antitrust laws until April 3, 2018, when DOJ announced it had filed a complaint against and entered into a settlement with Defendants regarding the same no-poach agreements complained of by Plaintiff. Prior to that time, no information in the public domain or available to Plaintiff suggested that Defendants had entered into illegal no-poach agreements.

99.     Defendants actively concealed, suppressed, and failed to disclose material facts to Plaintiff and members of the Class concerning Defendants' unlawful no-poach agreements. Criminal and civil penalties for entering into illegal no-poach agreements are severe. Not surprisingly, Defendants took affirmative measures to conceal these agreements.

100.     Defendants employed the following tactics to actively conceal details of their illegal no-poach agreement:

(a)     Communications between Defendants regarding the no-poach agreements were conducted by senior executives;

(b)      Senior executives engaged in direct lines of communications to manage and enforce the no-poach agreements; and

(c)      Senior executives met in person to discuss the Defendants' no-poach agreements, including the discussions that took place at a trade show in Berlin, Germany.

101.    In combination with their efforts to keep the no-poach agreements secret, Defendants misrepresented to Plaintiff and the Class that they were committed to abiding by antitrust and fair competition laws.

102.    Defendants publicly described themselves as competitors. Wabtec's 2017 Form l0-K listed one of Knorr's North American subsidiaries, NY Air Brake, as one of its "principal competitors." Knorr's 2017 Annual Report described the rail vehicle market as "highly competitive." These statements lulled Plaintiff and Class members into believing that Defendants were vigorously competing with each other, not acting as co-conspirators and agreeing not to compete in the market for rail equipment employees.

103.    Wabtec's Code of Business Conduct and Ethics, which "applies to all Wabtec directors, officers and employees, including individuals employed at domestic and foreign subsidiaries and joint ventures controlled by the Company," stated that company individuals "cannot engage in any understandings or agreements with competitors to restrain trade and must avoid the appearance of such conduct."[3]

104.    Similarly, Knorr's Code of Conduct, which "applies to all employees of the Knorr-Bremse Group worldwide," stated that company individuals were not permitted "to

---

[3] Wabtec Code of Business Conduct and Ethics,
https://www.wabtec.com/uploads/pdf/CodeofConduct.pdf.

conclude agreements with competitors on . . . prices, margins, costs, volumes, production performance, tendering, sales or other factors that influence the behavior of the company."[4]

105.    These statements impliedly represented to Plaintiff and the Class that Defendants were not violating antitrust laws by entering into anticompetitive agreements. Unbeknownst to Plaintiff and the Class, Defendants entered into agreements to restrain competition for employees like Plaintiff and other Class members.

106.    Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that Defendants conspired to restrict competition for Class members' services through anti-solicitation agreements. As discussed above, Defendants' discussions often occurred in private meetings or correspondences among top company executives.

107.    The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Class because they related to potential employment opportunities and increases in compensation.

108.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members allege herein.

## XI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

109.    Plaintiff incorporates the preceding paragraphs by reference.

---

[4] Knorr Code of Conduct, http://www.knorr-bremse.com/med ia/documents/group/compliance_1/02_KB_Code_of_Conduct_English_November_2012.pdf.

110.     Defendants knowingly, intentionally, and cooperatively engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class members' services through no-poach agreements with the purpose and effect of suppressing Class members' compensation and potential job opportunities and restraining competition in the market for Class members' services.

111.     Defendants' conduct injured Plaintiff and other Class members by depriving them of free and fair competition in the market for their services.

112.     Defendants' no-poach agreements are *per se* violations of Section 1 of the Sherman Act.

113.     As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have received compensation that is less than they would have received had the market for their services been competitive.

## XII.     DEMAND FOR JUDGMENT

114.     WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, respectfully requests:

(a)     That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; that Plaintiff be designated as a class representative; and that Plaintiff's counsel be appointed as class counsel;

(b)     That the unlawful conduct alleged herein be adjudged and decreed to violate the Sherman Act;

(c)     That the Defendants be permanently enjoined and restrained from continuing and maintaining the no-poach agreements as alleged in the complaint;

(d)    That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

(e)    That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(f)    That the Court award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII.   JURY DEMAND

115.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Date: May 16, 2018

**BROWN, GOLDSTEIN & LEVY, LLP**

By: */s/ Andrew D. Freeman*
Andrew D. Freeman (Bar No. 03867)
Neel K. Lalchandani (Bar No. 20291)
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Tel: 410-962-1030
Fax: 410-385-0869
adf@browngold.com
nlalchandani@browngold.com

**LABATON SUCHAROW LLP**
Gregory S. Asciolla (*pro hac vice pending*)
Jay L. Himes (*pro hac vice pending*)
Christopher J. McDonald (*pro hac vice pending*)
Karin E. Garvey (*pro hac vice pending*)
Brian Morrison (*pro hac vice pending*)
Jonathan Crevier (*pro hac vice pending*)
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

gasciolla@labaton.com
jhimes@labaton.com
cmcdonald@labaton.com
kgarvey@labaton.com
bmorrison@labaton.com
jcrevier@labaton.com

Steven J. Durham (*pro hac vice pending*)
1050 Connecticut Avenue, NW
Suite 500
Washington, D.C., 20036
Tel: (202) 772-1880
sdurham@labaton.com

*Counsel for Omar Sey and the Proposed Class*